## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| Cortec Corporation, | No. 22-cv-476 (KMM/ECW) |
| Plaintiff, | |
| v. | **ORDER** |
| Corpac GmbH & Co. KG; Verpa Folie Weidhausen GmbH; and Safe-Pack Solutions GmbH; | |
| Defendants. | |

This matter is before the Court on Defendants' Motion to Dismiss Plaintiff's Complaint. [ECF No. 8]. Defendants Corpac GmbH & Co. ("Corpac"), Verpa Folie Weidhausen GmbH ("Verpa"), and Safe-Pack Solutions GmbH ("Safe-Pack"), argue that the Court lacks personal jurisdiction over each of them and that Plaintiff Cortec Corporation ("Cortec") fails to state a claim upon which relief can be granted. As discussed below, Defendants' jurisdictional motion is granted in part and denied in part, and its motion for failure to state a claim is granted in part and denied in part.

## I.     Relevant Background

Cortec's Complaint provides the factual landscape for evaluating the Defendants' motion to dismiss for failure to state a claim, along with two U.S. Patents and a contract between Cortec and Corpac that are embraced by the pleadings. On the issue of personal jurisdiction, the Court also considers declarations submitted by the Chief Executive Officers of Corpac, Verpa, and Safe-Pack; a declaration from Cortec's Executive Vice

President of Sales and Marketing; and several documentary exhibits provided by the parties.

### A. Cortec's Complaint

Cortec is a Minnesota corporation that develops corrosion control products, including films that provide a physical, protective barrier on large metal objects, such as vehicles. [*See* Compl. ¶¶ 4, 8, ECF No. 1]. Cortec and its predecessors have used the "Cortec" and "VpCI" trademarks continuously for many years. [*Id.* ¶¶ 9–10]. Cortec has registered both these trademarks in the United States. [*Id.* ¶ 15]. Cortec alleges that it uses these marks in connection with corrosion control and inhibition products, including "[p]lastic film incorporating vapor phase corrosion inhibitors." [*Id.* ¶ 16].

Cortec also owns U.S. Patent number 10,697,070 (the '070 Patent) "covering an innovative and novel corrosion inhibiting film," and U.S. Patent Number 6,420,470 (the '470 Patent) "covering an innovative and novel flame retardant corrosion inhibiting film." [*Id.* ¶¶ 18–19]. The '470 Patent was applied for on May 18, 2000, and issued on July 16, 2002. [ECF No. 11-1 at 2]. The '070 Patent was applied for on March 27, 2017, and issued on June 30, 2020. [ECF No. 11-2 at 2].[1]

Corpac, Verpa, and Safe-Pack are all German companies with their principal places of business located in Germany. [*Id.* ¶¶ 5–7]. Corpac's predecessor was a company called

---

[1] Although these patents were not attached to the Complaint, they are appropriately considered in evaluating the Defendants' Rule 12(b)(6) motion. *Gillick v. Elliott*, 1 F.4th 608, 610 n.2 (8th Cir. 2021) (considering a contract whose contents were alleged in the complaint, but that was not attached to the pleading, in reviewing a district court's dismissal for failure to state a claim).

SHS Technische Verpackungen GmbH & Co. KG ("SHS"). [*Id.* ¶ 20]. In May 2004, Cortec and SHS executed a Distribution Agreement[2] that addresses how SHS, and its successor, Corpac, would purchase, repackage, and sell products covering Cortec's patents and trademarks in certain territories. [*Id.*; ECF No. 12-1 (Distribution Agreement)]. Specifically, the Distribution Agreement gave Corpac the right to purchase Cortec's products for resale in Germany, Switzerland, and Austria, and Cortec alleges that territory has never been expanded to include other countries or areas. [Compl. ¶ 21].

The Distribution Agreement also includes provisions limiting Corpac's use of the Cortec name and its trademarks; prohibiting Corpac from assigning or delegating the distributorship rights created by the agreement; prohibiting Corpac from directly or indirectly competing with Cortec; and requiring Corpac to keep secret Cortec's confidential information. [*Id.* ¶¶ 22–29]. The Distribution Agreement also includes a "Choice of Law and Jurisdiction" provision that requires disputes connected to the contract to be arbitrated according to the London Court of International Arbitration Rules; states that any arbitration must take place in Minneapolis, Minnesota; and provides that the governing law shall be the substantive law of the State of Minnesota.[3] [*Id.* ¶ 30].

---

[2] Like the '070 and '470 Patents, the Distribution Agreement was not attached to the Complaint, but its contents were alleged in the Complaint, and the authenticity of the copy provided by the Defendants is not in question. Therefore, it is properly considered in reviewing the Defendants' Rule 12(b)(6) motion. *Gillick*, 1 F.4th at 610 n.2.

[3] According to Cortec, "[n]one of the Defendants have sought to enforce the arbitration clause." [Doc. No. 21 at 4 n.1]. The Defendants have not moved to compel arbitration.

Originally, Verpa acted as the manufacturer or extruder for authorized Cortec VpCI® film that Corpac distributed under the Distribution Agreement. [*Id.* ¶ 32]. However, Cortec alleges that in 2018, Corpac, Verpa, and Safe-Pack entered into a joint venture known as the "CVS Partnership." [*Id.* ¶¶ 32–33]. The Managing Directors of the CVS Partnership are Corpac's CEO Jens Stottmeister, Verpa's CEO Andre Baumann, and Safe-Pack's CEO Lennart Schlütter. [*Id.* ¶ 33].

Safe-Pack and Verpa are Cortec's direct competitors in the market for vapor phase corrosion inhibiting ("VCI") films and packaging products. [*Id.* ¶ 34]. Because Corpac participates in the CVS Partnership with Cortec's competitors, Cortec claims that Corpac has breached the Distribution Agreement's non-assignment and non-delegation provisions. Cortec also claims that Corpac has breached the contract's territory restrictions, non-competition restrictions, and the limitations on Corpac's permitted uses of Cortec's trademarks and labeling. [*Id.* ¶¶ 36–49]. Specifically, Cortec alleges that Corpac has sold VpCI® film to Volkswagen in Poland and Volvo in Sweden through the CVS Partnership in violation of the territorial restrictions and the non-competition provisions in the Distribution Agreement. [*Id.* ¶¶ 42–43].

Corpac allegedly advertises Cortec's VpCI® products through the CVS Partnership in violation of the Distribution Agreement and in violation of Cortec's "Quality Control Guidelines." [*Id.* ¶ 45]. Specifically, Corpac promotes Cortec's VpCI® products without Cortec's required trademarks and labels, and instead uses Corpac's own alleged "Corpalin®" mark, along with generic marks without including the required Cortec trademarks and labels. [*Id.*]

Cortec asserts that Corpac has, through the CVS Partnership, falsely represented that it is the inventor of Cortec's VpCI® film on its website. [*Id.* ¶ 46]. Further, Cortec states that it "has serious and legitimate concerns Defendant Corpac, by and through the CVS Partnership, is selling product manufactured utilizing inferior materials sourced from South Korea utilizing Plaintiff's 'Cortec' and 'VpCI' valuable federally registered and incontestable trademarks." [*Id.* ¶ 47]. Cortec alleges that "[u]nauthorized products sold by Defendant Corpac, by and through the CVS Partnership, have been imported into the United States." [*Id.* ¶ 48]. Specifically, Cortec states "unauthorized Cortec VpCI® film and Cortec CorrLam® LD VpCI® Barrier Laminate have been imported into the United States in violation of Plaintiff Cortec's U.S. Patent and Trademark rights." [*Id.*]

Cortec alleges that through their sale of Cortec VCI film, Defendants are liable for indirect patent infringement. [*Id.* ¶¶ 50–55 (Count I)]. Cortec claims that Defendants have actively and knowingly induced others to import and use in the United States products covered by the '070 and '470 Patents. [*Id.* ¶ 52]. According to this claim, the "unauthorized Cortec VpCI® film sold by Defendants and covered by Cortec's '070 and '470 Patents has in fact been imported into and used in the United States." [*Id.* ¶ 53].

Cortec also asserts unfair competition claims under federal law, including: (1) indirect or contributory unfair competition or passing off [*Id.* ¶¶ 56–65 (Count II)]; (2) indirect or contributory false designation of origin [*Id.* ¶¶ 66–76 (Count III)]; and (3) indirect or contributory trademark infringement and counterfeiting [*Id.* ¶¶ 77–81 (Count IV)]. In support of these claims, Cortec alleges that Defendants have sold unauthorized Cortec VpCI® film that bears Cortec's trademarks knowing that the film

would be applied to products to be imported into and used in the United States. [*Id.* ¶¶ 57, 67]. In this way, they have knowingly contributed to infringement by others through that importation and use. [*Id.*] Defendants allegedly have done this "with the intent to deceive the public, including relevant U.S. consumers, that such film was approved by, sponsored by, or affiliated with [Cortec]." [*Id.* ¶¶ 58, 68].

In Counts V, VI, and VII of its Complaint, Cortec asserts state law claims under the Minnesota Uniform Deceptive Trade Practice Act, for unjust enrichment, and for breach of contract. [*Id.* ¶¶ 82–97].

## B. Defendants' Evidence

Defendants have submitted evidence regarding their contacts with the State of Minnesota. As noted above, Jens Stottmeister is the CEO of Corpac. He has served in that capacity since 2018. [Stottmeister Decl. ¶ 2, ECF No. 12]. Mr. Stottmeister confirms that Corpac distributes corrosion protection solutions and has its headquarters in Oberstenfeld, Germany. [*Id.* ¶ 3]. Corpac has no offices, manufacturing facilities, rental property, or physical presence of any kind in Minnesota. [*Id.*] Mr. Stottmeister explains that Corpac does not own, rent, or lease any real estate or equipment in Minnesota. [*Id.*] Corpac does not target any advertising to Minnesota and does not file Minnesota tax returns. [*Id.*] None of Corpac's approximately twenty employees reside in, work in, or make regular business trips to Minnesota. [*Id.* ¶ 4]. Cortec is Corpac's only raw material supplier located in Minnesota, and Corpac "does not derive any revenue from Minnesota customers." [*Id.* ¶¶ 5–6].

Mr. Stottmeister provided a copy of the Distribution Agreement between Cortec and Corpac's predecessor SHS. [*Id.* ¶ 7, Ex. 1]. He declares that since the Distribution Agreement was entered in May 2004, Cortec proposed modifications to it several times, but the contract expired. [*Id.* ¶ 8]. After the contract's expiration, Cortec proposed that Cortec and Corpac enter into a new distribution agreement with similar terms. [*Id.*] However, Corpac never agreed to, nor executed any proposed modifications or a new distribution agreement. [*Id.*]

Lennart Schlütter has been the CEO of Safe-Pack since 2022. [Schlütter Decl. ¶ 2, ECF No. 13]. Mr. Schlütter explains that Safe-Pack is a provider of industrial packaging solutions headquartered in Enger, Germany. [*Id.* ¶ 3]. Like Corpac, Safe-Pack has no offices, manufacturing facilities, rental properties, or other physical presence in Minnesota. [*Id.*] Safe-Pack does not own, rent, or lease any real estate or equipment in Minnesota, targets no advertising to Minnesota, and does not file tax returns in Minnesota. [*Id.*] None of Safe-Pack's approximately sixty employees reside in, work in, or make regular business trips to Minnesota. [*Id.* ¶ 4]. Safe-Pack does not directly purchase from any raw material suppliers located in Minnesota. [*Id.* ¶ 5]. Safe-Pack does not derive any revenue from Minnesota customers. [*Id.* ¶ 6].

Andre Baumann has been Verpa's CEO since 1999. [Baumann Decl. ¶ 2, ECF No. 14]. Mr. Baumann declares that Verpa is a provider of film and packaging solutions with its headquarters in Weidhausen, Germany. [*Id.* ¶ 3]. Like Corpac and Safe-Pack, Verpa: has no offices, manufacturing facilities, rental property, or other physical presence in Minnesota; does not own, rent, or lease any real estate or equipment in Minnesota; does

not target any specific advertising campaign to Minnesota; and does not file tax returns in Minnesota. [*Id.*] None of Verpa's approximately ninety employees resides in, works in, or makes regular business trips to Minnesota. [*Id.* ¶ 4]. Verpa does not directly purchase from any raw material suppliers located in Minnesota and derives no revenue from Minnesota customers. [*Id.* ¶¶ 5–6].

### C. Plaintiff's Evidence

Cortec has also presented evidence regarding the relationship between Cortec and Corpac and the personal-jurisdiction issue raised by Defendants' motion to dismiss. Cliff Cracauer is Cortec's Executive Vice President of Sales and Marketing. [Cracauer Decl. ¶ 1, ECF No. 22]. Mr. Cracauer declares that Corpac purchased more than $20 million of Cortec's product between 2004 and 2022, most of which was Cortec's "Masterbatch." [*Id.* ¶ 5]. Masterbatch is a chemical solution that can be used to manufacture many anti-corrosion products including VCI films, bags, and sheets. [*Id.*] According to Mr. Cracauer, the Agreement between Cortec and Corpac did not expire in 2010. [*Id.* ¶ 10]. Mr. Cracauer declares that the Agreement was even amended in October 2013 to limit Corpac's authorized territory to Germany. [*Id.* ¶ 11].

Mr. Cracauer states that "Corpac has had regular, ongoing and consistent contacts with Minnesota." [*Id.* ¶ 15]. For example, SHS's principal Gerhard Stottmeister traveled to Minnesota "on numerous occasions for the purpose of negotiating a formal distribution relationship between Cortec and Corpac, culminating in the May 12, 2004 Agreement." [*Id.*] Since that Agreement was executed, "Corpac communicated with Cortec's Minnesota headquarters on a regular basis via telephone, email, and videoconference." [*Id.* ¶ 16].

"Cortec hired a sales representative at its Minnesota headquarters who spoke fluent German to better facilitate its communications and relationship with Corpac." [*Id.*] Corpac paid Cortec for its products to Cortec's Minnesota bank account with U.S. Bank. [*Id.* ¶ 17]. According to Mr. Cracauer, "[m]ultiple Corpac representatives attended every Cortec annual global sales meeting for distributors from 2010 forward." [*Id.* ¶ 6]. "Every other year, such meeting was held in St. Paul, Minnesota at the St. Paul Hotel." [*Id.* ¶ 18]. In fact, Corpac representatives traveled to Minnesota in 2017 for the sales meeting at the St. Paul Hotel, where they were presented with Cortec's "Top Ten Distributor" award. [*Id.* ¶ 18 & Ex. 2.]

## II.  Personal Jurisdiction

The Court begins with Defendants' motion to dismiss for lack of personal jurisdiction under Federal Rule of Civil Procedure 12(b)(2). Absent personal jurisdiction, "it would be improper to consider [the motion to dismiss for failure to state a claim]; the absence of personal jurisdiction means the absence of judicial power to reach the merits of a case." *Patrick's Restaurant, LLC v. Singh*, File No. 18-cv-00764 (ECT/KMM), 2019 WL 2869082, at *5 (D. Minn. July 3, 2019) (citing *Pope v. Elabo GmbH*, 588 F. Supp. 2d 1008, 1012 (D. Minn. 2008)). As explained below, the Court finds that Cortec has made a sufficient prima facie showing of personal jurisdiction with respect to Corpac, but not as to Verpa or Safe-Pack.

### A.  Legal Standard

On motion to dismiss for lack of personal jurisdiction, the "plaintiff[] bear[s] the burden of establishing a prima facie showing of jurisdiction, and we view the [facts] in the

light most favorable to the plaintiff[].” *Kaliannan v. Liang*, 2 F.4th 727, 733 (8th Cir. 2021), *cert. denied*, 142 S. Ct. 758 (2022) (quoting *Whaley v. Esebag*, 946 F.3d 447, 451 (8th Cir. 2020)) (third alteration in *Kaliannan*). This prima facie showing “is accomplished by pleading sufficient facts ‘to support a reasonable inference that the defendant[] can be subjected to jurisdiction within the state.’” *K-V Pharm. Co. v. J. Uriach & CIA, S.A.*, 648 F.3d 588, 591–92 (8th Cir. 2011) (quoting *Dever v. Hentzen Coatings, Inc.*, 380 F.3d 1070, 1072 (8th Cir. 2004)) (alteration in *K-V Pharm Co.*). The “evidentiary showing required at the prima facie stage is minimal” and may be supported by affidavits and exhibits outside of the pleadings. *Id.*

The Court may exercise personal jurisdiction when “authorized by the forum state’s long-arm statute and permitted by the Due Process Clause of the Fourteenth Amendment.” *Viasystems, Inc. v. EBM-Papst St. Georgen GmbH & Co., KG*, 646 F.3d 589, 593 (8th Cir. 2011). Two avenues of personal jurisdiction are relevant here: Minnesota’s long arm statute, which “extends as far as the Due Process Clause allows”; and the federal long arm statute, Federal Rule of Civil Procedure 4(k)(2). *Hazelden Betty Ford Found. v. My Way Betty Ford Klinik GmbH*, 504 F. Supp. 3d 966, 973–74 (D. Minn. 2020). The federal long-arm statute is subject to an identical analysis as traditional personal jurisdiction, but considers contacts between the defendant and the United States as a whole, rather than Minnesota alone. *Id.* at 974.[4] In addition to complying with the statute, the exercise of

---

[4] To exercise specific jurisdiction under Rule 4(k)(2), a case must arise under federal law and the defendant must not be “subject to jurisdiction in any state’s courts of general jurisdiction.” Fed. R. Civ. P. 4(k)(2)(A).

personal jurisdiction must also comport with due process. "Critical to due process analysis is that the defendant's conduct and connection with the forum state are such that he should reasonably anticipate being haled into court there." *Bros. & Sisters in Christ, LLC v. Zazzle, Inc.*, 42 F.4th 948, 951 (8th Cir. 2022) (quoting *Kaliannan*, 2 F.4th at 733).

Cortec alleges that the Court may exercise specific jurisdiction over Defendants. Accordingly, the Court must determine whether Defendants have sufficient minimum contacts with Minnesota and whether Cortec's claims "arise out of or relate to" Defendants' contacts." *Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.*, 141 S. Ct. 1017, 1025 (2021) (quoting *Bristol-Myers Squibb Co. v. Superior Court of Cal.*, 131 S. Ct. 1773, 1780 (2017)). Five factors guide the Court's analysis regarding the Defendants' contacts with Minnesota. *Bros. & Sisters in Christ*, 42 F.4th at 952; *Johnson v. Arden,* 614 F.3d 785, 794 (8th Cir. 2010). The three "primary factors" include: "(1) the nature and quality of the contacts with the forum state; (2) the quantity of the contacts; [and] (3) the relationship of the cause of action to the contacts."[5] *Arden*, 614 F.3d at 794. These factors are "closely interrelated" and often considered together. *Digi-Tel Holdings, Inc. v. Proteq Telecomms. (PTE), Ltd.*, 89 F.3d 519, 523 (8th Cir. 1996). The "secondary factors" are "(4) the interest of [the state] in providing a forum for its residents; and (5) the convenience or inconvenience to the parties." *Arden*, 614 F.3d at 794.

---

[5] The Eighth Circuit has noted that the third factor "distinguishes whether the jurisdiction is specific or general." *Arden*, 614 F.3d at 794. No party here contends that Minnesota has general jurisdiction over any Defendant.

In the context of specific jurisdiction, the plaintiff's claims "must 'arise out of or relate to the defendant's contacts' with the forum." *Bristol-Myers*, 137 S. Ct. at 1780 (cleaned up). "[P]ut just a bit differently, there must be an affiliation between the forum and the underlying controversy, principally, [an] activity or an occurrence that takes place in the forum State and is therefore subject to the State's regulation." *Ford Motor*, 141 S. Ct. at 1025 (internal quotations omitted).[6]

## B. Corpac

Corpac argues that Cortec's prima facie showing of jurisdiction is insufficient. Corpac points to Mr. Stottmeister's declarations that the company has no physical presence in Minnesota, neither owns nor rents real estate here, has no employees here, generates no revenue from Minnesota customers, and does not file tax returns here. Corpac asserts that jurisdiction is lacking because its business relationship with Cortec is insufficient to establish minimum contacts with Minnesota, the choice-of-law provision in the allegedly

---

[6] The parties disagree about whether Federal Circuit law must be applied to the jurisdictional analysis for the patent-infringement claims and any non-patent claims that go hand-in-hand with them. [ECF No. 21 at 11; ECF No. 23 at 2]. The Federal Circuit's test for specific jurisdiction requires the plaintiff to show: (1) that the defendant directed its activities at residents of the forum; and (2) that the plaintiff's claim arises out of or relates to the defendant's activities with the forum. If the plaintiff makes such a showing, then the burden shifts to the defendant to show that jurisdiction would be constitutionally unreasonable. *See Inamed Corp. v. Kuzmak*, 249 F.3d 1356, 1360 (Fed. Cir. 2001) (discussing the Federal Circuit's articulation of the test and citing *Burger King v. Rudzewicz*, 471 U.S. 462, 476–77 (1985) regarding the defendant's burden to show that jurisdiction would be unreasonable). However, neither party suggests that applying Federal Circuit law results in a different outcome, and having carefully reviewed the matter, the Court concludes that it would reach the same conclusion as to each Defendant regardless of whether Federal Circuit or Eighth Circuit law applies.

expired Agreement cannot confer jurisdiction on its own, and the allegations in the Complaint fail to show a connection between Minnesota and Cortec's causes of action. [ECF No. 6–9].

Cortec argues that Corpac has had "regular, ongoing and consistent contact with Minnesota" through the businesses' eighteen-year distribution relationship. [ECF No. 21 at 10]. Cortec points out that Corpac personnel visited Minnesota on multiple occasions to negotiate the Agreement; Corpac purchased over $20 million in Cortec product over the course of the parties' relationship; Corpac makes payments to Cortec's Minnesota-based bank account; Corpac regularly communicates with Cortec's main offices in White Bear, Minnesota; Corpac's representatives have regularly traveled to Minnesota for Cortec's sales meetings; and the Agreement contains a Minnesota choice-of-law provision and a Minnesota venue clause. [*Id.* at 13–14].

Viewing the allegations and evidence in the light most favorable to Cortec, the Court finds that Cortec has met its prima facie burden to show that Corpac has sufficient contacts with Minnesota for the exercise of specific personal jurisdiction. Certainly, Corpac has demonstrated, through the declaration of its CEO, that it has no sustained physical presence in Minnesota, does not pay taxes here, and does not have revenue from Minnesota customers. Nevertheless, Corpac has had numerous and substantial contacts with Minnesota and purposefully directed its activities toward the forum through its lengthy, ongoing business relationship with Cortec.

Eighteen years ago, the CEO of Corpac's predecessor, SHS, traveled to Minnesota to negotiate the Distribution Agreement. For the nearly two decades that followed, Corpac

has maintained an ongoing business relationship with the Minnesota-based company, purchasing over $20 million of Cortec's product during that period. The parties' contract designates Minnesota as the venue for resolution of disputes arising out of or relating to the agreement, and it selects Minnesota law as the substantive law to govern any dispute. Corpac has communicated regularly with Cortec's employees at Cortec's Minnesota headquarters and made substantial payments to Cortec's bank in Minnesota. On multiple occasions, Corpac's employees have traveled to Minnesota for Cortec's sales meetings. These contacts are not sporadic, "random," "attenuated," or "fortuitous." *Creative Calling Sols., Inc. v. LF Beauty Ltd.*, 799 F.3d 975, 980 (8th Cir. 2015). Instead, even if the record does not show that Corpac is essentially "at home" in Minnesota, these contacts show that Corpac purposefully availed itself of the benefits of conducting activities in Minnesota.

Corpac's position attempts to downplay the significance of several points of contact with Minnesota. But it does so by isolating each contact from other contacts and suggesting that the individual consideration is, on its own, insufficient to establish personal jurisdiction. This rhetorical gambit is unsuccessful.

For example, Corpac correctly notes that the existence of a choice-of-law provision is insufficient, on its own, to establish minimum contacts with the forum. [ECF No. 10 at 7]. That's true, so far as it goes. But the choice-of-law provision in this case is not *on its own*. The parties' selection of a Minnesota forum in the Distribution Agreement is but one piece of evidence indicating, at this early stage, that Corpac has purposefully availed itself of the privilege of doing business in Minnesota. *K-V Pharm. Co.*, 648 F.3d at 594 ("Although choice-of-law provisions specifying that the forum state's laws govern are

insufficient on their own to confer personal jurisdiction, they provide further evidence of a defendant's deliberate affiliation with the forum State and the reasonable foreseeability of possible litigation there.") (quotation omitted).

Similarly, relying on *Eagle Technology v. Expander Americas, Inc.*, 783 F.3d 1131 (8th Cir. 2015), Corpac asserts that the business relationship between it and Cortec "alone fails to establish sufficient minimum contacts to justify the imposition of personal jurisdiction." [ECF No. 10 at 7]. Again, Cortec's prima facie showing consists of more than the existence of a business relationship *alone*. But equally important, the *Eagle Technology* decision is meaningfully distinguishable. The *Eagle Technology* court upheld a district court's finding that it lacked personal jurisdiction over a foreign corporate parent company where the plaintiff had only done business with the subsidiary, and the parent company had no contacts with the State of Missouri. 783 F.3d at 1136–37. Notably, the district court found that the corporate parent did not have any contacts with the state, never sent employees to the state, and "no money was received or sent to the state." *Id.* at 1135. Corpac is not in a position comparable to that of a detached holding company having no contacts with the forum. Rather, as explained above, it has purposefully directed its activities to Minnesota through its business relationship with Cortec, and can reasonably anticipate being subject to litigation here.

Corpac further suggests that the choice-of-law and venue provisions of the Distribution Agreement are irrelevant to the personal jurisdiction analysis because the agreement "is expired on its face" and the "unspecified course of conduct after expiration is insufficient to support a finding that the entire agreement is still valid." [ECF No. 23 at

8 (citing *Webb Candy, Inc. v. Walmart Stores, Inc.*, Case No. 09-CV-2056 (PJS/JJK), 2010 U.S. Dist. LEXIS 55985, at \*20 (D. Minn. June 7, 2010))]. Whether the Distribution Agreement remains valid as to all terms, expired entirely, or was modified in some respects is a subject of significant factual disagreement in this case, and Corpac points to no authority to suggest that such a factual dispute should be resolved in its favor when answering a jurisdictional question at the pleadings stage. Nor does *Webb Candy*, a case that is not explicitly about personal jurisdiction, suggest that in deciding a Rule 12(b)(2) motion, a court can or should resolve a disputed question of fact, especially one intertwined with the merits of a claim. In fact, in assessing the prima facie showing of jurisdiction, the Court must view the evidence relevant to the Rule 12(b)(2) motion in the light most favorable to Cortec. *See Prestige Hosp. Gr., Inc. v. Flagship Servs. Corp.*, 2001 WL 228418, at \*4 (D. Minn. Feb. 27, 2001) (noting that the question of the court's "jurisdiction over defendants is intertwined with the resolution of factual issues going to the merits of Pertige's claims," and comparing the proper "analytical process" under Eighth Circuit precedent for resolving a Rule 12(b)(2) motion to that applied on summary judgment). In short, neither the record nor the standard of review allows the Court to conclude that the choice-of-law provision is irrelevant to the jurisdictional inquiry.

Finally, and perhaps most critically, the Court finds that Corpac's contacts with Minnesota are sufficiently related to the cause of action to support the exercise of personal jurisdiction over Corpac. Arguing to the contrary, Corpac focuses on the alleged actions taken in Europe—e.g., alleged sales of VCI film outside of Corpac's authorized European territory, anti-competitive activity in European markets, etc.—and asserts that the contacts

with Minnesota have not caused Cortec's alleged injuries. [ECF No. 10 at 9]. However, Corpac reads this aspect of the personal-jurisdiction standard too narrowly. "Plaintiffs are not required to prove that a specific injury or unlawful act was caused during one of many contacts; rather, specific jurisdiction is warranted when the defendant purposely directs its activities at the forum state and the litigation results from injuries relating to defendant's activities in the forum." *Hazelden Betty Ford Found.*, 504 F. Supp. 3d at 976 (cleaned up). Here, the record shows that Corpac purposely directed activities at Minnesota to obtain the rights to distribute Cortec's VCI films in certain territories and limited permission to use Cortec's trademarks. The allegations involve a robust twenty-year business relationship and its aftermath. The litigation involves claims directly related to those activities because Corpac is accused of having breached the agreement that authorizes Corpac to sell Cortec's products and use its marks. Seeking out products or permission to sell those products from a Minnesota supplier, obtaining exclusive territorial rights from that supplier, getting permission from the supplier to use its trademarks, and maintaining a lengthy relationship with that supplier through frequent communication and regular employee trips to Minnesota provide a sufficient basis for Corpac to reasonably anticipate being sued in Minnesota in connection with allegedly violating the terms of that business arrangement.

For these reasons, the jurisdictional motion is denied with respect to Corpac.

### C. Safe-Pack and Verpa

Applying the same legal framework, the Court reaches the opposite conclusion with respect to the other Defendants. Safe-Pack and Verpa argue that the Complaint fails to allege any facts suggesting that either directed any activities at Minnesota sufficient to

support the exercise of personal jurisdiction over them. Further, they contend that the declarations of their respective CEOs demonstrate they have had no contacts with Minnesota. Cortec does not identify any contacts between Verpa or Safe-Pack and Minnesota that would allow the Court to exercise personal jurisdiction. However, Cortec asserts that its claims in this case "arise from actions occurring subsequent to the merger of Corpac, Verpa, and Safe-Pack" such that Corpac's contacts with Minnesota can be imputed to the other Defendants. [ECF No. 21 at 22]. The Court finds that Cortec has failed to show that Verpa or Safe-Pack has had the requisite minimum contacts with Minnesota for the exercise of personal jurisdiction and disagrees that its imputed-contacts argument carries the day. Therefore, the Defendants' Rule 12(b)(2) motion is granted with respect to these two Defendants.

Cortec relies on three cases addressing successor liability and imputed contacts in support of its argument that Safe-Pack and Verpa may be subject to personal jurisdiction in Minnesota—*In re RFC and ResCap Liquidating Trust Litigation*, No. 13-cv-3451 (SRN/HB), 2017 WL 1483374 (D. Minn. Apr. 25, 2017); *Massi v. Holden*, No. 09-1821 (MJD/JJG), 2011 WL 6181258 (D. Minn. Dec. 13, 2011); and *MJCM, L.L.C. v. Sky Bank*, No. Civ.A H-05-0664, 2005 WL 2121549 (S.D. Tex. Aug. 31, 2005). But none of these decisions support  finding of imputed contacts in this case.

In *In re RFC*, for example, the plaintiff argued that the court had personal jurisdiction over a defendant, InterLinc, because InterLinc was the legal successor to the company, Hometown, with which the plaintiff had a contractual relationship. 2017 WL 1483374, at *3–9. The court determined that the jurisdictional inquiry collapsed into

whether the plaintiff adequately alleged a fraudulent transfer from Hometown to InterLinc, which was "the sole basis for successor liability available to" the plaintiff, and then carefully scrutinized the facts in the complaint under the applicable substantive law. *Id.* at *6–9. Ultimately, the court found that the plaintiff "set forth a prima facie case of personal jurisdiction" by asserting sufficient facts to show badges of actual fraud in the conveyance of assets from Hometown to InterLinc. *Id.* at *8–9. The *Massi* court similarly relied on the principle that a corporate predecessor's contacts with the forum can be imputed to a foreign corporate successor when forum law would make the successor liable for its predecessor's acts. 2011 WL 6181258, at *5; *accord MJCM*, 2005 WL 2121549, at *6.

Each of the cases involves a corporate predecessor and successor, and the imputation of the former's contacts to the latter. But Cortec nowhere suggests that either Verpa or Safe-Pack is the legal successor to Corpac. Cortec certainly does not allege that Corpac has been dissolved. Cortec attempts to impute Corpac's contacts with Minnesota to two distinct corporate entities with which Corpac allegedly does business in European markets through the CVS Partnership. But cases like *In re RFC*, *Massi*, and *MJCM*, which make no mention of joint enterprises, provide no support for doing so. And Cortec points to no authority finding that contacts can be imputed from one distinct corporate entity to another simply because they are engaged in business ventures together.

At the hearing on Defendants' motion, counsel for Cortec suggested that the nature of the Defendants' relationship may be even more intertwined than it appeared when the Complaint was filed. In the Complaint, Cortec alleged that Verpa, Safe-Pack, and Corpac formed the "CVS Partnership," but at oral argument, plaintiff's counsel represented that

the Defendants' website had been updated. Counsel indicated that Defendants began promoting themselves as a single entity, giving the impression they are working in unison and raising the possibility that the defendants may have merged. The Court notes that Defendants' counsel represented that no such merger had occurred, but most importantly, the Complaint contains no facts from which the reasonable inference of a merger could be drawn. The Complaint does not allege that any of the three defendants ceased to exist because of a purported merger.[7] In fact, the pleading indicates that all three companies remain distinct entities cooperating in a joint business venture. Under these circumstances, the Court finds that Cortec has not made a prima facie showing that the Defendants have merged such that all three companies could be determined to be subject to a singular personal jurisdiction analysis.

For these reasons, the Defendants' Rule 12(b)(2) motion is granted with respect to Safe-Pack and Verpa.

### D.    Jurisdictional Discovery

Cortec suggests that if the Court has concerns regarding the exercise of personal jurisdiction over any of the Defendants, Cortec should be given the opportunity to conduct limited discovery, including discovery regarding "the details of the merger between

---

[7] It is worth noting that, under Minnesota law, when there is a corporate merger, "the separate existence of all constituent organizations except the surviving organization ceases." Minn. Stat. § 302A.641, subd. 2(b).

Corpac, Safe-Pack and Verpa."[8] [ECF No. 21 at 21]. Whether to grant jurisdictional discovery is a discretionary decision. *In re Municipal Stormwater Pond*, 429 F. Supp. 3d 647, 658 (D. Minn. 2019). "Jurisdictional discovery is warranted when facts that could give rise to jurisdiction are in dispute." *Lawhead v. L. Offs. of Joseph Martin Carasso*, 482 F. Supp. 3d 867, 874 (D. Minn. 2020) (citing *Viasystems*, 646 F.3d at 598).

The Court declines to delay its decision on the Defendants' motion so that Cortec may first pursue jurisdictional discovery. Cortec has offered only speculation about the purported merger between the Defendants and has demonstrated no contacts at all between Verpa or Safe-Pack and Minnesota. *See Municipal Stormwater Pond*, 429 F. Supp. 3d at 658 (explaining that jurisdictional discovery "should be permitted when a plaintiff offers 'documentary evidence, and not merely speculations or conclusory allegations,' regarding a defendant's contacts with the forum state"). This does not mean that Corpac's relationship with Verpa and Safe-Pack is beyond all inquiry with regards to the merits of this case. Yet, in the absence of any showing that Verpa and Safe-Pack have directed their activities to Minnesota, the Court will not hold the motion to dismiss in abeyance, keeping them in the case as nominal defendants so that Cortec can fish for some evidence to argue its merger theory. However, no party should use this ruling to argue that this Court has permitted, prohibited, limited, or otherwise defined the appropriate boundaries for any specific discovery request in this proceeding.

---

[8] Because the Court finds that Cortec has shown that Corpac has sufficient minimum contacts with Minnesota to support the exercise of personal jurisdiction over it in this case, the Court does not address Cortec's requests for jurisdictional discovery as to Corpac.

## III.   Failure to State a Claim

Having addressed the Defendants' motion regarding personal jurisdiction, the Court turns to the merits. Corpac argues that Cortec's Complaint should be dismissed in its entirety for failure to state a claim. For the reasons that follow, the Rule 12(b)(6) motion is granted in part and denied in part.

### A. Legal Standard

To survive a Rule 12(b)(6) motion to dismiss, a complaint must contain "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). This standard does not require the inclusion of "detailed factual allegations" in a pleading, but the complaint must contain facts with enough specificity "to raise a right to relief above the speculative level." *Id.* at 555. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements," are not sufficient. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 555). In applying this standard, the Court must assume the facts in the complaint to be true and take all reasonable inferences from those facts in the light most favorable to the plaintiff. *Morton v. Becker*, 793 F.2d 185, 187 (8th Cir. 1986); *see Waters v. Madson*, 921 F.3d 725, 734 (8th Cir. 2019). But the Court need not accept as true any wholly conclusory allegations or legal conclusions that the plaintiff draws from the facts pled. *Glick v. W. Power Sports, Inc.*, 944 F.3d 714, 717 (8th Cir. 2019).

### B. Indirect Patent Infringement—Count I

Count I of Cortec's Complaint alleges that Corpac is inducing infringement of Cortec's Patents by knowingly selling Cortec VpCI® film to others who apply the film to

22

products outside the United States for importation into the United States. Corpac seeks dismissal of Count I pursuant to Rule 12(b)(6). Corpac argues that Cortec fails to state a claim for induced patent infringement because (1) the Complaint does not plausibly show that Defendants had actual knowledge of the asserted patents; (2) the Complaint does not plausibly allege that Defendants had the specific intent to induce infringement; (3) the Complaint does not support a reasonable inference that at least one direct infringer of the asserted patent exists; and (4) Cortec's claims fail under the doctrine of patent exhaustion.

Under 35 U.S.C. § 271(b), "[w]hoever actively induces infringement of a patent shall be liable as an infringer." Notably, section 271(b) "does not, on its face, foreclose liability for extraterritorial acts that actively induce an act of direct infringement that occurs within the United States." *Merial Ltd. v. Cipla Ltd.*, 681 F.3d 1283, 1302 (Fed. Cir. 2012); *Enplas Display Device Corp v. Seoul Semiconductor Co., Ltd.*, 909 F.3d 398, 408 (Fed. Cir. 2018) (stating that "liability for induced infringement under § 271(b) can be imposed based on extraterritorial acts, provided that the patentee proves the defendant possessed the requisite knowledge and specific intent to induce direct infringement in the United States").

To state a claim of induced infringement under § 271(b), a plaintiff must allege facts from which one could draw the reasonable inference (1) that another party directly infringed the patent, (2) that the defendant knew that other party's conduct constituted infringement, and (3) that the defendant had the specific intent to encourage that infringement. *See In re Bill of Lading Transmission and Processing Sys. Pat. Litig.*, 681 F.3d 1323, 1333, 1339 (Fed. Cir. 2012); *accord Sanofi v. Watson Labs. Inc.*, 875 F.3d 636, 643–44 (Fed. Cir. 2017) (discussing elements of an induced-infringement claim). "This

23

does not mean, however, that [a plaintiff] must prove its case at the pleading stage." *In re Bill of Lading*, 681 F.3d at 1339.

### *Intent*

Having reviewed the Complaint as a whole, the Court concludes that it fails to plausibly allege that Corpac had the specific intent to encourage a third party to infringe Cortec's patents through importing infringing goods into the United States. "Intent is an essential part of the knowledge requirement. 'It must be established that the defendant possessed **specific intent** to encourage another's infringement and not merely that the defendant had knowledge of the acts alleged to constitute infringement.'" *Regents of Univ. of Minn. v. AT&T Mobility LLC*, 135 F. Supp. 3d 1000, 1009 (D. Minn. 2015) (quoting *DSU Med. Corp. v. JMS Co., Ltd.*, 471 F.3d 1293, 1306 (Fed. Cir. 2006)) (emphasis in *Regents*). "[I]nducement requires that the alleged infringer knowingly induced infringement and possessed specific intent to encourage another's infringement." *Id.* (quoting *DSU Med. Corp.*, 471 F.3d at 1306).

Here, Cortec's theory is that Corpac has sold "unauthorized VpCI® film" covered by the '070 and '470 Patents to third parties. Specifically, Cortec claims that Corpac knows the film it sold is covered by the asserted patents and that the "film would be applied to products outside the United States for import into and use in the United States." [Compl ¶ 52]. Though the Complaint is light on details, when read as a whole and taking into account the appropriate Rule 12(b)(6) lens, the Complaint comes close to pleading a plausible induced patent infringement claim. However, the problem is that the Complaint lacks facts from which it could reasonably be inferred that Corpac had the specific intent

24

to encourage any third party to import an infringing article into the United States. The Complaint contains little more than conclusory assertions regarding such specific intent.

If, as Cortec alleges, Corpac's specific intent was to induce others to import into products covered by the inventions claimed in Cortec's Patents, they must demonstrate that reality with something more than conclusory allegations. Admittedly, Cortec alleges that Corpac, through the CVS Partnership, sold unauthorized VpCI® film to Volkswagen in Poland and Volvo in Sweden. But Volkswagens and Volvos are not manufactured exclusively for the U.S. automobile market, and there is no specific allegation that either manufacturer is one of the "others" that Corpac intentionally induced into infringing Cortec's asserted patents through vehicles imported into the United States. While Cortec alleges that its VpCI® film and CorrLam® LD VpCI Barrier Laminate are products that have been imported into the United States in violation of Cortec's patent rights, the Complaint is missing any facts about what Corpac did to encourage "others" to import those products into the United States or from which the Court could draw the reasonable inference that it in fact encouraged direct infringement here. *See Nncrystal US Corp v. Nanosys, Inc.*, Civil Action No. 19-1307-RGA, 2022 WL 1091283, at *2 n.2 (D. Del. Apr. 12, 2022) (rejecting plaintiffs conclusory allegations of defendant's specific intent to induce manufacturing partners to import products made using a patented process into the United States); *cf. Pulse Elecs., Inc. v. U.D. Elec. Corp.*, Case No.: 3:18-cv-00373-BEN-MSB, 2021 WL 981123, at *39 (S.D. Cal. Mar. 16, 2021) (granting defendant's summary judgment motion where the plaintiff "failed to come forward with evidence in the record

showing Defendant took affirmative steps to cause the accused ICMs to be imported or sold within the U.S. sufficient to create a genuine issue of fact as to induced infringement").

This analysis should not be interpreted as establishing a pleading hurdle for induced infringement that is impossible to clear. Indeed, some courts have denied motions to dismiss induced infringement claims concerning extraterritorial inducement and third-party importation of infringing products where the pleading offers just a little more than the conclusory allegations Cortec's Complaint. For example, in *Semcon IP Inc. v. Kyocera Corporation*, No. 2:18-CV-00197-JRG, 2019 WL 1979930, at *4 (E.D. Tex. May 3, 2019), the court described the complaint's allegations in terms not that different from those in Cortec's pleading. But Semcon specifically identified at least one product imported into the United States that included the allegedly infringing technology. Semcon also identified at least one of the defendant Kyocera Corporation's customers, Kyocera International, that was allegedly selling infringing products to end-users in the United States. This allowed the court to conclude that it was plausible that Kyocera Corporation's sales knowingly and intentionally induced that customer to directly infringe the asserted patents. *Id.*

By contrast, Cortec's Complaint does not identify a product that has been imported into the United States that includes infringing VCI film. Nor has Cortec alleged facts from which it could reasonably be inferred that Corpac intentionally encouraged a specific third-party infringer to directly infringe Cortec's patents through importation and sales to end-users in the United States. Cortec's Complaint provides only vague or conclusory hints at such details. Its identification of "unauthorized Cortec VpCI® film and Cortec CorrLam® LD VpCI® Barrier Laminate" as the imported, infringing articles is simply not enough for

the Court to draw the reasonable inferences required for a plausible induced infringement claim. As it stands, the Complaint lacks factual allegations from which the Court could reasonably infer that Corpac possessed the specific intent to encourage a third party to infringe Cortec's patents through the importation of allegedly infringing items. Accordingly, as currently pled, Count I of the Complaint is dismissed without prejudice for failure to state a claim.

However, the Court finds that it is possible that Cortec may be able to amend its pleading to remedy the shortcoming with its induced infringement claim. Therefore, Cortec will be given an opportunity to file an Amended Complaint re-asserting its indirect patent infringement claim under section 271(b). Such an Amended Complaint must be filed within 30 days of the date of this Order. [9]

### *Knowledge*

Corpac's argument that the Complaint fails to plausibly show that it had knowledge of the '470 Patent and the '070 Patent is not at all convincing. Corpac and Cortec have been in a close business relationship for nearly two decades. Both work in the same industry—the development and sale of corrosion control products. Their lengthy business relationship centers around Cortec's patents covering corrosion inhibiting films and flame

---

[9] Because the Court has given Cortec an opportunity to file an Amended Complaint to replead this claim if Cortec wishes to do so, after discussing the issue of intent, the Court briefly addresses some of Corpac's other arguments should an Amended Complaint follow. For the sake of transparency, if Cortec elects to file an Amended Complaint reasserting an indirect patent infringement claim, and Corpac again moves to dismiss such an amended claim pursuant to Rule 12(b)(6), raising the same or largely similar arguments to those presented here, the Court is likely to address such arguments summarily.

retardant corrosion inhibiting films. Corpac buys, repackages, and sells Cortec's products allegedly covered by the asserted patents under the parties' Distribution Agreement. Certainly, one can imagine a pleading that offers more descriptive or direct allegations concerning a defendant's awareness of an asserted patent, but Cortec's Complaint by no means fits Corpac's characterization as one that contains nothing more than wholly conclusory allegations. This case is closer to those cases that adequately allege a defendant's pre-suit knowledge of a patent. *See Oxygenator Water Tech., Inc. v. Tennant Co.*, 2020 WL 4572062, at *3–5 (D. Minn. Aug. 7, 2020) (examining standards concerning allegations of knowledge under the Fed. R. Civ. P. and citing case examples of allegations adequately showing pre-suit knowledge of a patent). Under these circumstances, the Court concludes that the induced infringement claim is not deficient for failure to adequately allege Corpac's knowledge of the asserted patents.

### At Least One Direct Infringer

The Court is also not persuaded by Corpac's arguments falling under the heading that "the Complaint does not support a reasonable inference that at least one direct infringer of the Asserted Patents exists."[10] For example, Corpac criticizes the Complaint for failure to include "detailed claim charts" or identify "a single patent claim or claim limitation." [ECF No. 10 at 15]. But Corpac cites no authority for the proposition that claim charts specifically identifying claims and claim limitations must be recited in a complaint to

---

[10] This heading actually contains several different argument about the inadequacy of the Complaint, some of which are addressed above.

properly allege an infringement claim. And the caselaw does not require such a robust set of allegations. Indeed, "[a] plaintiff is not required to plead infringement on an element-by-element basis." *Bot M8 LLC v. Sony Corp. of Am.*, 4 F.4th 1342, 1352 (Fed. Cir. 2021). If Cortec elects to file an Amended Complaint re-asserting a claim for induced infringement, the proper time for providing detailed claim charts and other disclosures can be addressed through the Scheduling Order.

Corpac further asserts that the Complaint is deficient because it is silent with respect to the time period applicable for each of the asserted Patents. Specifically, Corpac points out that the '470 Patent's statutory limitation period expired May 18, 2020, and the period of coverage for the '070 Patent did not begin until June 30, 2020. But, Corpac argues, the Complaint fails to identify exactly when the allegedly infringing conduct occurred, leaving the claim subject to dismissal. [ECF No. 10 at 17]. Corpac does not provide any authority to support the proposition that failure to identify acts of infringement falling within a specific period of coverage for an asserted patent is fatal to a claim of patent infringement at the motion to dismiss stage. This argument provides no basis for dismissal of Count I of the Complaint.

### *Patent Exhaustion*

Finally, Corpac argues that Cortec's sales of its products to Corpac extinguished Cortec's patent rights under the doctrine of patent exhaustion. [Doc. No. 10 at 18–19]. The Court concludes that it cannot resolve the issue of patent exhaustion on the face of the Complaint.

The Federal Circuit has explained that patent exhaustion is an affirmative defense. *See ExcelStor Tech., Inc. v. Papst Licensing GMBH & Co. KG*, 541 F.3d 1373, 1376 (Fed. Cir. 2008). Affirmative defenses generally do not provide a viable basis for a motion to dismiss for failure to state a claim; instead, a complaint may be dismissed based on an affirmative defense only "where the complaint *clearly* shows the existence [of] a defense." *United States v. Xcel Energy, Inc.*, 759 F. Supp. 2d 1106, 1118 (D. Minn. 2010) (quotation omitted).

Under the doctrine of patent exhaustion, "[w]hen a patentee sells one of its products . . . the patentee can no longer control that item through the patent laws—its patent rights are said to 'exhaust.'" *Impression Prods, Inc. v. Lexmark Int'l, Inc.*, 137 S. Ct. 1523, 1529 (2017). However, in *Impression Products*, the Supreme Court recognized "a fundamentally different situation" is presented when a licensee knowingly makes sales outside the scope of the license granted to it by the patentee. *Id.* at 1535 (discussing *General Talking Pictures Corp. v. Western Elec. Co.*, 304 U.S. 175, 181–82 (1938)). In that scenario, the patentee is not prohibited from suing the licensee for patent infringement. *Id.*

Here, Cortec argues that the doctrine of patent exhaustion does not apply because the Distribution Agreement grants Corpac a license to use its patented technologies within limited territories where Corpac is allowed to sell patented articles. According to Cortec, this case falls within the exception recognized in *Impression Products* because the Complaint alleges that Corpac knowingly made sales outside the scope of that license. Corpac strongly disagrees with Cortec's characterization of the Distribution Agreement as establishing a patent license.

Taking the factual allegations in the Complaint as true and drawing the reasonable inferences from those allegations in Cortec's favor, the Court cannot conclude from the face of the Complaint that the defense of patent exhaustion is both clearly established and fatal to this case. Moreover, the record at this early stage provides an insufficient basis for the Court to definitively resolve the parties' disagreement about whether the Distribution Agreement actually establishes a patent license such that Cortec's sales to Corpac do not trigger the doctrine of patent exhaustion.

### C. Indirect or Contributory Unfair Competition and Trademark Infringement Claims—Counts II, III, and IV

In Counts II, III, and IV, Cortec asserts claims of indirect or contributory unfair competition and trademark infringement under sections 32 and 43 of the Lanham Act, 15 U.S.C. §§ 1114, 1125. Corpac seeks dismissal of the Lanham Act claims, arguing that Cortec failed to allege facts establishing that Corpac sold non-genuine goods in a false or misleading manner, failed to adequately allege likely or actual confusion, and failed to allege facts showing unauthorized importation.

The Lanham Act's unfair competition provision imposes liability on:

> (1) Any person who, on or in connection with any goods or services . . . uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—
>
>> (A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person . . . .

15 U.S.C. § 1125(a)(1)(A). To state a direct claim for trademark infringement or unfair competition under this provision, a plaintiff must allege that the defendant's actions "created a likelihood of confusion, deception or mistake on the part of the consuming public," and that the defendant's use of the plaintiff's mark "falsely designates the origin of a product." *My Pillow, Inc. v. LMP Worldwide, Inc.*, 331 F. Supp. 3d 920, 933 (D. Minn. 2018) (internal quotations and alterations omitted).

"A defendant can also be secondarily liable for contributory infringement,"[11] which involves "'intentionally causing or knowingly facilitating the infringement of the plaintiff's mark by a third party.'" *Phoenix Ent. Partners LLC v. Boyte*, 247 F. Supp. 3d 791, 797 (S.D. Tex. 2017) (quoting *1-800 Contacts, Inc. v. Lens.com, Inc.*, 722 F.3d 1229, 1240 (10th Cir. 2013)); *Georgia-Pac. Consumer Prod. LP v. Myers Supply, Inc.*, Case No. 6:08-cv-6086, 2009 WL 2192721, at *3 (W.D. Ark. July 23, 2009) (same). "There must be underlying direct infringement by someone other than the secondarily liable defendant in order to hold that defendant liable on a contributory infringement theory." *Boyte*, 247 F. Supp. 3d at 797; *Phoenix Ent. Partners, LLC v. Star Music, Inc.*, No. 16-CV-4078 (PJS/FLN), 2017 WL 3498645, at *3 (D. Minn. Aug. 15, 2017) (dismissing contributory Lanham Act claims for failure to allege plausible claims of direct infringement).

---

[11] Contributory infringement derives from the common law of torts to impose liability on those who facilitate or encourage infringement and is generally traced to the Supreme Court's decision in *Inwood Laboratories, Inc. v. Ives Laboratories, Inc.*, 456 U.S. 844 (1982).

According to the Complaint, Corpac is knowingly contributing to others' importation of unauthorized "Cortec" and "VpCI" marked products into the United States, thereby improperly suggesting Cortec's affiliation with those goods. The goods are "unauthorized" because Corpac allegedly failed to adhere to the conditions under which Corpac is allowed to use Cortec's marks, including producing VpCI film in accordance with Cortec's quality control measures and limiting its distribution to its authorized territory.

Based on a review of the Complaint as a whole, the Court finds that Cortec's indirect or contributory unfair competition and trademark infringement claims suffer from a flaw similar to the one that undermines Cortec's induced patent infringement claim. Specifically, the Complaint does not allege facts that allow one to draw the reasonable inference that Corpac provided those goods to a third-party intending that third-party to infringe Cortec's marks or with knowledge of that infringement. It similarly contains only conclusory statements concerning the importation of any goods by a direct infringer and does not explain anything about the basis for Corpac's awareness that any infringement was occurring in the United States. In this way, the Complaint fails to provide adequate notice of the conduct Corpac engaged in that forms the basis of the contributory unfair competition and infringement claims.

Claims for contributory unfair competition and infringement have survived motions to dismiss for failure to state a claim where plaintiffs identify facts that permit courts to draw reasonable inferences that defendants were aware of third-parties' direct infringement, but continued to supply goods to the third-party or otherwise authorize their

conduct in the face of that knowledge. *E.g.*, *Lavazza Premium Coffees Corp. v. Prime Line Distrib., Inc.*, 575 F. Supp. 3d 445, 455–56, 472 (S.D.N.Y. 2021) (denying motion to dismiss where the complaint identified the defendant's customers who were violating the plaintiffs' trademarks, the defendant's customers were selling the plaintiffs' competitors' coffee using the plaintiff's trademarks, and despite being aware of that infringement, the defendant "continued to sell its products to the infringing customers"); *Rosenshine v. A. Meshi Cosmetics Indus. Ltd.*, 2020 WL 1914648, at *1–2, *10 (E.D.N.Y. Mar. 30, 2020) (finding claims plausible where plaintiff alleged that foreign defendant approached identified U.S. customers about selling counterfeit versions of plaintiff's hair gel using the plaintiff's trademark, plaintiff notified defendant with cease-and-desist demand, but defendant continued encouraging customers to sell hair gel using the protected name).[12]

Cortec's Complaint does not contain a comparable level of detail. In its response to the motion to dismiss, Cortec points to Corpac's alleged unauthorized sales to Volkswagen and Volvo beyond its approved territory. However, Cortec stopped short of alleging or even implying that either of those automobile companies is a direct infringer, that Corpac

---

[12] *See also Peek v. Cloppenburg KG v. Revue, LLC*, No. 11 Civ. 5967 (DAB), 2012 WL 4470556, at *1–2, *5 (S.D.N.Y. Sept. 19, 2012) (denying motion to dismiss contributory trademark infringement counterclaim where the pleading alleged that German company was using confusingly similar marks to the claimant's protected marks in connection with U.S. clothing sales through a third-party online store, and company admitted to knowing third party was offering the allegedly infringing clothes for sale in the U.S.); *Ferring B.V. v. Fera Pharm., LLC*, No. CV 13-4640 (SJF)(AKT), 2015 WL 4623507, at *4, *7–9 (E.D.N.Y. July 6, 2015) (analyzing sufficiency of allegations of defendant's intentional inducement of third-party to use plaintiff's trademarks and basis for knowledge of third-party's infringing conduct and collecting cases), *R&R adopted*, No. 13-CV-4640 (SJF)(AKT), 2015 WL 4611990 (E.D.N.Y. July 31, 2015).

was aware of that infringement, or that either has imported goods into the United States.[13] [ECF No. 21 at 31–33].

Accordingly, as currently pled, the Court finds that the Complaint fails to state a claim for contributory unfair competition or trademark infringement in Counts II–V.[14] As with Count I, the Court will dismiss Counts II-V without prejudice and give Cortec leave to replead them, if it chooses to do so, because Cortec may be able to address the pleading deficiency through an Amended Complaint.

As above, the Court briefly addresses additional arguments Corpac raised concerning the contributory unfair competition or trademark infringement claims that the Court does not find particularly persuasive. First, although Cortec addressed the question of consumer confusion only minimally, the Court is not persuaded by Corpac's argument that these claims are subject to dismissal under Rule 12(b)(6) for failure to allege a likelihood of consumer confusion. Indeed, "the confusion inquiry is fact-intensive and generally inappropriate for a motion to dismiss." *My Pillow, Inc.*, 331 F. Supp. 3d at 934 (crediting allegations of confusion for an unfair-competition claim).

Second, the Court finds Corpac's suggestion that Cortec attempted to amend its Complaint through its opposition memorandum unconvincing. In response to Corpac's

---

[13] As pled, Cortec has not asserted contributory trademark infringement or unfair competition claims premised upon an extra-territorial application of the Lanham Act.

[14] Count V is an unfair competition claim asserted under the Minnesota Deceptive Trade Practices Act ("MDTPA"), Minn. Stat. § 325D.44. Cortec does not dispute that its MDTPA claim is subject to the same analysis as its Lanham Act claims. *Phoenix Ent. Partners, LLC v. Lapadat*, 123 F. Supp. 3d 1114, 1122–23 (D. Minn. 2015).

argument that the Lanham Act claims failed because Cortec alleged only that Corpac sold genuine goods marked with the "Cortec" and "VpCI" marks, Cortec pointed to cases indicating that a breach of a license agreement—such as by selling goods beyond an authorized territory or failing to meet quality control standards—can form the basis of a Lanham Act claim. Corpac insists that the Distribution Agreement is not a licensing agreement and Cortec failed to allege that it was. [ECF No. 23 at 13]. Some courts have stated "'that one who exceeds the scope of [a] license [to use the plaintiff's trademark] is potentially liable not just for breach of the license agreement but also for trademark infringement' under the Lanham Act." *Masters v. UHS of Delaware, Inc.*, No. 4:06CV1850-DJS, 2008 WL 11391102, at *5 (E.D. Mo. Apr. 30, 2008) (quoting *Brennan's Inc. v. Dickie Brennan & Co.*, 376 F.3d 356, 364 (5th Cir. 2004)). Here, the Distribution Agreement appears to establish a distributorship relationship between Cortec and Corpac, but it also contains terms addressing Corpac's limited permission to use Cortec's trademarks. [Distribution Agreement ¶ 2(d)]. A license is simply "a limited permit to another to use the mark." 3 Thomas J. McCarthy, *McCarthy on Trademarks and Unfair Competition* § 18:1 (5th ed.). And although the Distribution Agreement does not call itself a "licensing deal," to use Corpac's term, that is not dispositive of the question whether the contract granted Corpac a license. *See Blue Mountain Holdings Ltd. v. Bliss Nutraceticals, LLC*, No. 1:20-CV-1837-TWT, 2022 WL 2316386, at *4 (N.D. Ga. June 27, 2022) ("To determine whether a contract for trademark rights is a license or an assignment, courts are governed not by the contract's form or labels, but by the actual legal effect of its terms." (citing 3 McCarthy § 18:5).

36

In addition, although Corpac argues that it cannot be liable for trademark infringement based on the sale of genuine goods, the Court finds that whether any goods allegedly sold by Corpac were genuine is a fact question that is not amenable to resolution on a motion to dismiss. Indeed, the discussion of the genuineness of goods found in *Minnesota Mining and Manufacturing Co. v. Rauh Rubber, Inc.*, 943 F. Supp. 1117, 1128–30 (D. Minn. 1996), a case on which Corpac relies, demonstrates just how fact-bound such an inquiry can be. For purposes of surviving a motion to dismiss, the Court finds that Cortec's Complaint adequately alleges that Corpac sold goods that are not genuine because they do not conform to Cortec's quality control standards.

### D. State Law Claims

#### 1. Supplemental Jurisdiction

Corpac next argues that if all the federal claims have been dismissed, the Court should decline to exercise supplemental jurisdiction over any remaining state law claims. Of course, under 28 U.S.C. § 1367(c)(3), a district court may decline to exercise supplemental jurisdiction over a pendent state claim if it has dismissed all claims over which it has original jurisdiction. Because the Court gives Cortec an opportunity to file an Amended Complaint, the Court will not address this argument at this time.[15]

---

[15] If there were another basis for the exercise of original jurisdiction over the state claims, § 1367(c)(3) would not be applicable. In the Complaint, however, Cortec has not alleged an independent basis for subject-matter jurisdiction over those claims.

### 2.  Breach of Contract

To state a claim for breach of contract, Cortec must allege (1) the formation of a contract; (2) performance by Cortec of any conditions precedent to Cortec's right to demand performance by Corpac, and (3) breach of the contract by Corpac. *Park Nicollet Clinic v. Hamann*, 808 N.W.2d 828, 833 (Minn. 2011).

Corpac first argues that the Distribution Agreement's plain text establishes that the contract has expired, directly contradicting Cortec's argument that the agreement has remained in full force and effect at all relevant times. Although the terms of the agreement provided for a fixed term and renewal period, continuing performance beyond the stated term of an agreement may form a new contract. *See Bardine v. Petersen*, No. A20-0949, 2021 WL 1733337, at *4 (Minn. Ct. App. May 3, 2021) (citing *Fischer v. Pinske*, 243 N.W.2d 733, 734 (Minn. 1976); *Bolander v. Bolander*, 703 N.W.2d 529, 542 (Minn. App. 2005)). Corpac's argument raises a fact issue unsuitable for resolution at the motion to dismiss stage.

Corpac next argues that Cortec fails to adequately allege the existence of a breach of the contract's terms because the Complaint does not state when alleged sales to Volkswagen and Volvo occurred, nor does it allege that Corpac delivered products to those auto manufacturers outside the prescribed territory. [ECF No. 10 at 26–27]. But Corpac is on sufficient notice of Cortec's allegation that it breached the agreement through sales to those manufacturers made outside the permissible territory.

Corpac further argues that Cortec waived any argument that it adequately alleged a breach-of-contract claim by failing to adequately respond to the arguments raised in

Corpac's opening brief. [ECF No. 23 at 15]. The Court declines to find waiver under these circumstances. Cortec's Complaint adequately alleges a breach of contract claim and its opposition brief sufficiently addressed its claim in its background discussion. Accordingly, the motion to dismiss the breach of contract claim is denied.

### 3. Unjust Enrichment

Corpac argues that Cortec's unjust enrichment claim must be dismissed because Cortec has alleged the Distribution Agreement is an enforceable contract, and unjust enrichment is an equitable remedy available only when there is no express contract between the parties. But a plaintiff is permitted to plead an unjust enrichment claim in the alternative to a breach of contract claim "without fear of dismissal," and Cortec has properly done so here. *Motley v. Homecomings Fin., LLC*, 557 F. Supp. 2d 1005, 1014 (D. Minn. 2008). The motion is denied with respect to the unjust enrichment claim.

### IV.   Order

Based on the discussion above, **IT IS HEREBY ORDERED that:**

1. Defendants' Motion to Dismiss Plaintiff's Complaint [ECF No. 8] is **GRANTED IN PART and DENIED IN PART**.

2. The motion is granted to the extent that Defendants Verpa Folie Weidhausen GmbH and Safe-Pack Solutions GmbH are **DISMISSED WITHOUT PREJUDICE** for lack of personal jurisdiction pursuant to Fed. R. Civ. P. 12(b)(2).

3. The motion is granted to the extent that Counts I, II, III, IV, and V of the Complaint are **DISMISSED WITHOUT PREJUDICE** for failure to state a claim pursuant to Fed. R. Civ. P. 12(b)(6).

4. The motion is denied in all other respects.

5. If Plaintiff chooses to replead the claims alleged in Counts I–V of the Complaint, Plaintiff may file an Amended Complaint. Any Amended Complaint must be filed within 30 days of the date of this Order.

Date: January 12, 2023

    *s/Katherine Menendez*
Katherine Menendez
United States District Judge